# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

NANCY KUGLER,

        Plaintiff,

  v.                                                    Case No. 12-C-840

LEXISNEXIS OCCUPATIONAL
HEALTH SOLUTIONS, INC.,

        Defendant.

## DECISION AND ORDER

In this tort action brought under diversity jurisdiction, Defendant LexisNexis Occupational Health Solutions, Inc. has filed a motion for summary judgment. In short, it argues that a release and settlement signed by Plaintiff Nancy Kugler bars this action. For the reasons given below, the motion will be denied.

**I. Background**

In 2010 Plaintiff was employed by Aurora and participated in a random drug test as a part of her employment. The drug test was conducted by ACL Services, Inc., a subsidiary of Aurora. ACL found that Plaintiff's urine sample contained dihydrocodeine, a controlled substance in the codeine family. Although ACL is an Aurora company, drug tests are reviewed by independent medical review officers (MROs), independent physicians whose role is to ensure the integrity of the drug testing process. Defendant LexisNexis is an organization offering independent MRO services, and ACL sent the results to LexisNexis for confirmation. LexisNexis reviewed the results and then

confirmed its findings that Plaintiff's urine had tested positive for dihydrocodeine. When Aurora learned of the results, it immediately terminated Plaintiff's employment.

Eventually Plaintiff got LexisNexis to send her sample to another lab, which found the sample to contain hydrocodone (for which Plaintiff had a prescription) but *not* dihydrocodeine. Even so, for reasons not in the record, Aurora did not hire her back. Eventually Plaintiff sued Aurora and ACL, and the parties entered into a settlement and release agreement. LexisNexis, which was not a party to that agreement, now wishes to enforce the agreement's terms to bar Plaintiff's lawsuit against it.

## II. Analysis

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### A. *Res Judicata*

LexisNexis argues that the settlement agreement and subsequent court judgment are *res judicata* that may not be disturbed with the filing of a new lawsuit. The dispute centers on the meaning of the terms of the parties' settlement agreement. Although LexisNexis was not party to the agreement, it relies on the clause that defines Aurora (which *was* party to the agreement) as including "Aurora Health Care, Inc. and any of its present, former and future owners, parents, affiliates and subsidiaries, and all of its and their employees, agents, servants, representatives . . . ." (ECF No. 37, ¶ 5.) As the independent medical review officer services company, LexisNexis argues that it was Aurora's "agent" and was thus included within the definition of "Aurora."

**1. "Agent" is Not Ambiguous**

The first question is whether the term "agent" is ambiguous. If the term is ambiguous, then a court may look to extrinsic evidence—evidence outside the contract itself—to discern its meaning. *Nature Conservancy of Wis., Inc. v. Altnau,* 2008 WI App 115, ¶ 6, 313 Wis.2d 382, 756 N.W.2d 641 (Wis. 2008). Specifically, Plaintiff wants the court to consider the fact that LexisNexis was never a party to the release negotiations; that it has no financial relationship with Aurora; and that the parties to the agreement never intended that LexisNexis would have been covered by the agreement. In addition, there is no evidence in the record that LexisNexis gave any consideration either to Kugler or to Aurora. If enforceable, the release is a very valuable instrument, and so it is unclear why LexisNexis would be entitled to receive such a large benefit from arms'-length parties when it did not pay anything for that benefit. All of these factors could be suggestive of the contracting parties' intent that LexisNexis was not to be included within the release.

Agents and agency are terms commonly used in the law, but the definition of the word "agent" does not always lend itself to an obvious application, in part because the concept of agency is a broad one. One may be an agent with respect to some matters but not others; one may be an independent contractor agent or a servant agent; and some agents are actually called agents while most operate under other titles. *Arsand v. City of Franklin,* 83 Wis. 2d 40, 47, 264 N.W.2d 579, 583 (1978). Thus, in one case the Wisconsin Court of Appeals had little trouble concluding that a statute's use of the term "agent" was ambiguous. *Kettner v. Wausau Ins. Companies,* 191 Wis. 2d 723, 733, 530 N.W.2d 399, 403 (Wis. Ct. App. 1995) ("because this term has more than one meaning, we conclude that the meaning of agent as used in § 893.80 is ambiguous.")

In another case, however, upon which LexisNexis relies heavily, the court of appeals found no ambiguity in a release that used the term "agent." In *Wagner v. Hicks,* the Wagners sued Dr. Hicks for veterinary malpractice after their cows experienced health problems. 163 Wis.2d 1094, 474 N.W.2d 529 (Wis. Ct. App. 1991). Previously, they had sued Germania Automated Dairy Systems, alleging that problems with Germania's milking equipment had caused the health problems. In settlement of that dispute, plaintiffs signed a release waiving any claims against Germania and its agents. Dr. Hicks had been retained by Germania to provide veterinary services to the plaintiffs' cows, and "Hicks and Germania's general manager submitted affidavits agreeing that all of Hicks's services were provided at Germania's request and that Germania 'retained the right to authorize or not authorize the extent to which Dr. Hicks performed testing, culturing and treatment of the Wagner herd.'" *Id.* at *1. In addition, "Germania did authorize and approve the testing, culturing and treatment that was performed for Dr. Hicks for the Wagner herd." *Id.* Based on this evidence, the court concluded Dr. Hicks was Germania's agent and thus entitled to invoke the release against Germania and its agents. In doing so, it poured cold water on the suggestion that the term "agent" was ambiguous: "The Wagners also contend that they never intended to have their release of claims extend to independent contractors such as Hicks. Independent contractors are agents, however, if the test cited above is satisfied. . . . The Wagners cannot rely on their misunderstanding of the term 'agent' to introduce an ambiguity into their liability release form." *Id.* at *2.

I conclude that although the term "agent" is broad and therefore subject to a number of interpretations, that is not enough to render it ambiguous. In some cases parties deliberately draft broad terms into contracts (e.g., "best efforts" or "of the essence") with the expectation that,

although the contours of the term are not perfectly definable at the time of signing, the term can be applied based on facts that develop later. Here, when signing the agreement, no one knew how many agents Aurora might have, or what kind of agents they might be. What they did know (if they considered the question at all) was that Aurora's agents—in whatever capacity they served—would enjoy the benefits of the release. The fact that the term is broad does not make it ambiguous, as the court in *Wagner* held under similar facts. The question of whether one person is an agent of another is something that is frequently litigated because it can often be a fact-intensive inquiry. However, even if the question of *whether* someone is an agent is sometimes difficult, that does not mean that the term "agent" *itself* is ambiguous.

**2. LexisNexis was not Aurora's Agent**

Agency is "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006). In *Wagner, supra*, the court applied these factors in determining whether Dr. Hicks was Germania's agent. Having concluded that the term "agent" was unambiguous, the court concluded that Dr. Hicks was indeed an agent, which entitled him to coverage by the release.

Dr. Hicks' relationship with Germania contrasts sharply with the relationship between LexisNexis and Aurora, however. Specifically, the *Wagner* court found it important that Germania retained control over how Dr. Hicks conducted his medical care of the herd. "Over several months Hicks repeatedly visited the Wagner farm, usually accompanied by a Germania representative. In the course of these visits, he prescribed the medication [at Germania's direction] that led to this

5

lawsuit." *Id.* at *1. Germania controlled the treatment Dr. Hicks provided and even accompanied him on his visits to the farm. Thus, it was relatively easy to conclude that he was an "agent" because Germania paid him, directed him, and controlled his work.

Here, by contrast, the entire purpose of using a third-party medical review officer is to *avoid* that level of control. The MRO is intended to be a neutral, independent party who safeguards the legitimacy of the testing process to ensure that the results are not colored by either side and to protect the employee's medical information from the employer. The MRO might be paid by one party, but that party, by definition and design, exercises no control over the agent's work apart from whatever the standard industry expectations and contracts provide for medical review. That is, the MRO is expected to perform standard MRO services—a scope of work—but does so without his actual duties being controlled in any way by the payor. The party who hires the MRO cannot direct the medical officer's work or even inquire about the medical information the MRO finds once the process has begun. In fact, independence from the lab or the employer is the key purpose of the MRO role and is listed first in the Department of Transportation's regulations: "As an MRO, you have the following basic responsibilities: (a) Acting as an independent and impartial 'gatekeeper' and advocate for the accuracy and integrity of the drug testing process." 49 C.F.R. § 40.123. Thus, by design, neither Aurora nor ACL could exercise any kind of meaningful control over LexisNexis. This is confirmed by the declaration of Barbara Bigler, president of ACL (the testing lab), who stated that Aurora did not even have a written contract with LexisNexis, much less any control over it. "Aurora has no control over LexisNexis' employees or its MROs, nor does it have any control

over how LexisNexis conducts its reviews or analyses of drug test results including the means, manner, or technology implemented."[1] (ECF No. 44 at ¶ 7.)

An MRO is in many ways no different from an arbitrator or referee. Although an arbitrator might be paid by one or both parties to a dispute, and although his decision is controlled by the questions the parties pose and other rules of arbitration, it would be a stretch to consider the arbitrator an "agent" of either of the parties. The very reason he is hired is that the parties desire a fair and independent process rather than a process subject to control or influence by one or more parties. Just as one party cannot call up an arbitrator *ex parte* to seek favorable treatment, neither the employer nor employee can meddle with the medical review process conducted by the MRO.

That medical review officers are not agents is supported by release clauses culled from other cases. For example, in *Mayfield v. National Ass'n for Stock Car Auto Racing, Inc.,* stock car driver Jeremy Mayfield sued NASCAR and a testing lab after testing positive for a banned substance. In connection with his racing career, Mayfield had signed a release containing the following clause:

> I HEREBY RELEASE, DISCHARGE, COVENANT NOT TO SUE, AND AGREE TO HOLD HARMLESS NASCAR, its officers, employees, directors, agents, **and such testing facilities and Medical Review Officers** as NASCAR retains or selects in connection with implementation of this Policy, . . . arising out of the implementation of the Policy, or any act or omission in connection therewith, including and without limitation, the testing of specimens and the publication of the test results and circumstances giving rise to such test or tests to any third party or parties by NASCAR or said testing facilities or said Medical Review Officers, as well as the officers, employees, and agents of each of them, or any other person or entities.

674 F.3d 369, 373-374 (4th Cir. 2012) (emphasis added).

---

[1] LexisNexis argues that Bigler would not be in a position to know about Aurora's level of control. My analysis does not turn on Bigler's testimony. Even so, I note that Aurora is even one more step removed from the process than ACL is. ACL was the party that sent the lab work to LexisNexis.

Similarly, in *McCown v. Gray Kentucky Television, Inc.,* 295 S.W.3d 116, 118 (Ky. Ct. App. 2008), the plaintiff signed a release stating: "I hereby release and hold harmless the Company, the medical review officer or other medical professionals, the laboratory, their employees, agents and contractors from liability arising from this request to furnish this or any specimen or sample . . ." In both cases the release explicitly names the medical review officer in *addition* to the employer and its agents ("*and* such testing facilities and Medical Review Officers . . .") rather than lumping them in under the catch-all term "agent." Although other parties' treatment of the issue is certainly not dispositive in this case, such releases suggest at a minimum that the lawyers drafting those releases did *not* consider MROs to be agents of the employer.

In sum, because one of the key roles of medical review officers is independence from the employer or the lab, I cannot conclude that LexisNexis was the agent of either of them.[2]

### 3. The Settlement Agreement is not a General Release of All Claims

Finally, LexisNexis argues that the settlement agreement constitutes a general release of all claims that arose out of the testing snafu, regardless of whether it was a party to the agreement or not. A release may be a general release of all claims, even against non-parties, if that was the parties' actual intent. *Brown v. Hammermill Paper Co.,* 88 Wis.2d 224, 233–34, 276 N.W.2d 709 (1979).

In *Rebholz v. Lakeland Leisure Corp.,* the plaintiffs signed a settlement entitled "RELEASE—IN FULL OF ALL CLAIMS (EXCEPT THOSE EXPRESSLY RESERVED HEREIN)." 337 Wis.2d 426, 805 N.W.2d 734, 2011 WI App 136, 2011 WL 3444521, *1 (Wis.

---

[2] The fact that various statutes might describe an MRO as a "service agent" does not change the analysis. The question is whether one meets the legal test for agency, and here LexisNexis does not.

Ct. App. 2011). Later, they brought claims against parties who had not signed the release. When these parties invoked the release, the court found the release to be a general release and thus dismissed the claims. Among other things, the agreement released all claims not just against the named parties but against "all other persons, firms, and corporations." *Id.* at *4. Given that broad language, as well as the title of the agreement (releasing "in full of all claims"), it was no trouble for the courts to find the agreement to be a general release.

Here, the terms of the settlement agreement make it clear that it is *not* a general release. The very first sentence of the agreement refers to the cases Kugler filed with the Equal Opportunity Commission and the Wisconsin Department of Workforce Development. The next sentence cites the civil action she filed against Aurora and ACL. In reference to these aforementioned actions, the recitals continue: "WHEREAS, Aurora denies any unlawful discrimination and denies that there is any validity to the above-referenced administrative actions and lawsuit commenced by Kugler; and WHEREAS, it is the desire of the parties in the interest of avoiding further proceedings with respect to these matters to compromise and finally, fully and completely settle all of Kugler's claims in their entirety." (ECF No. 37 at 1.) Thus, the stated intent of the agreement is to settle claims arising out of Kugler's employment and to avoid further proceedings "with respect to these matters," *i.e.,* the employment-related matters highlighted in the recitals. (*Id.*) The rest of the agreement requires Aurora to pay Kugler and provide a neutral letter of reference, and in return Kugler will dismiss all charges "which currently are pending against Aurora." (*Id.*) Then, in the release section, the agreement provides that "to the extent permitted by law, Kugler releases Aurora (as defined below) from, and covenants not to sue Aurora with respect to, any and all claims Kugler has against Aurora." (*Id.* at 2.) It further recites a litany of claims being released: "This release

9

includes any and all matters in connection with . . . acts of disability discrimination, discrimination for use of a lawful product, retaliation, suspension, discharge, [etc.] . . . allegedly committed against Kugler by Aurora." (*Id.*) Finally, the agreement stipulates that "If Kugler brings an action against Aurora in violation of this release . . . Kugler agrees that prior to the commencement of such an action she will tender back to Aurora all payments made to Kugler as consideration for this release." (*Id.* at 2-3.)

Wherever possible, the release clearly indicates that the claims being released are those that were brought *against Aurora,* not all claims that might ever be brought against everyone. The agreement further makes clear that the operative limiting principle is the contract's definition of "Aurora," which, as noted above, includes its employees, directors, subsidiaries and "agents." Notably, the very clause upon which LexisNexis relies (deeming itself Aurora's "agent") would be rendered superfluous if the agreement were truly a general release of all claims against all persons. In sum, the contract is clear that it is a merely release of all claims against Aurora, as defined in the agreement.

Although the language of the contract is clear, it is noteworthy that there is no indication that Kugler received anything in compensation as a result of releasing claims against non-Aurora entities. In *Rebholz* the court noted that "we may consider factors such as whether Rebholz has received 'full satisfaction, or that which the law must consider as such,' in determining the nature and scope of the release . . . . In other words, the difference between the amount of damages Rebholz actually sustained and the sum paid by State Farm under the terms of the release is relevant to determine whether the amount received was intended to be and was in fact received in full satisfaction of the wrong." 2011 WL 3444521, *3 (citation omitted). As suggested earlier,

LexisNexis is asking a court to construe a document in its favor when it never apparently gave any consideration in exchange for such favorable treatment. Although not dispositive, it suggests that LexisNexis is merely trying to receive a windfall rather than attempting to enforce an agreement it actually had a concrete interest in.

### III. Conclusion

For the reasons given above, the motion for summary judgment is **DENIED**. The motion to seal is **GRANTED**, as the document in question is a confidential settlement agreement. The document will remain under seal. The clerk will place the case on the calendar for a telephonic scheduling conference.

**SO ORDERED** this 22nd day of April, 2014.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court